HOWE (STORRS v.). See Case No. 13,495.

---

## Case No. 6,775.

### HOWE et al. v. UNDERWOOD et al.

[1 Fish. Pat. Cas. 160.] [1]

Circuit Court, D. Massachusetts. Feb., 1854.

PATENTS—INFRINGEMENT—EXPERIMENTS—SEWING MACHINES.

1. There is no evidence in this case that leaves a shadow of doubt, that, for all the benefit conferred upon the public by the introduction of a sewing machine, the public are indebted to Mr. Howe.

2. A machine, in order to anticipate any subsequent discovery, must be perfected—that is, made so as to be of practical utility, and not merely experimental, and ending in experiment. Until of practical utility, the public attention is not called to the invention; it does not give to the public that which the public lays hold of as beneficial.

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

3. If an invention is an experiment only, and ends in experiment, and is laid aside as unsuccessful, however far it may have been advanced, however many ideas may have been combined in it, which, subsequently taken up, might, when perfected, make a good machine—still, not being perfected, it has not come before the public as a useful thing, and is, therefore, entirely inoperative, as affecting the rights of those coming afterward.

[Cited in Cook v. Ernest, Case No. 3,155; Gottfried v. Phillip Best Brewing Co., Id. 5,633; Allis v. Buckstaff, 13 Fed. 890; Thayer v. Hart, 20 Fed. 694.]

4. Though a prior inventor has gone to a certain extent, if he fall short of making a complete machine, practically useful, those who come after him may secure to themselves the advantages of his invention. The first inventor gave nothing to the public. His so-called invention was only an idea, never carried out in a machine that could anticipate one subsequently invented.

[Cited in Goodyear Dental Vulcanite Co. v. Folsom, 3 Fed. 512; Washburn & Moen Manuf'g Co. v. Haish, 4 Fed. 904; Dreyfus v. Schneider, 25 Fed. 481; Kittle v. Hall, 29 Fed. 515; Electrical Accumulator Co. v. Julien Electric Co., 38 Fed. 127.]

This was an application for a provisional injunction to restrain the defendants from infringing the letters patent [No. 4,750] granted to Elias Howe, Jr., September 10, 1846, for an improved sewing machine, by the use and sale of the Singer machine, so called. The defendants denied the novelty of the invention of Howe, and relied, in support of their denial, mainly upon an alleged invention of Walter Hunt, in 1834. In connection with the evidence upon this point, they exhibited: 1. Some remains of a machine. 2. A new sewing machine, recently made by Walter Hunt, as a restoration of his old machine. 3. A new sewing machine, recently made by Walter Hunt, according to a description contained in his answer to an interrogatory in a previous deposition. The claims of Howe's patent are as follows:

I. The forming of the seam, by carrying a thread through the cloth by means of a curved needle on the end of a vibrating arm, and the passing of a shuttle furnished with its bobbin, in the manner set forth, between the needle and the thread which it carries, under a combination and arrangement of parts substantially the same with that described.

II. I also claim the lifting of the thread that passes through the needle-eye, by means of the lifting-rod, w, for the purpose of forming a loop of loose thread, that is to be subsequently drawn in by the passage of the shuttle, as herein fully described; said lifting-rod being furnished with a lifting-pin, u, and governed in its motions by the guide-pieces and other devices, arranged and operating substantially as described.

III. I claim the holding of the thread that is given out by the shuttle, so as to prevent its unwinding from the shuttle-bobbin, after the shuttle has passed through the loop, said thread being held by means of the lever, or clipping-piece, q, as herein made known, or in any other manner that is substantially the same in its operation and result.

IV. I claim the manner of arranging and combining the small lever, m, n, with the sliding-box, m, in combination with the spring-piece, z, for the purpose of tightening the stitch as the needle is retracted, as described.

V. I claim the holding the cloth to be sewn, by the use of a baster-plate, furnished with points for that purpose, and with holes, enabling it to operate as a rack in the manner set forth, thereby carrying the cloth forward, and dispensing altogether with the necessity of basting the parts together.

Joel Giles, for complainants.
Causten Browne, for defendants.

SPRAGUE, District Judge. This is an application for a preliminary injunction, by Elias Howe, Jr., and another, to restrain the defendants, Orison Underwood and others, from using a sewing machine, which, the complainants allege, is an infringement of their patent. This subject has been before the court on two former occasions; in a trial at law, in 1852, when the same person, Howe, was plaintiff, and in a bill in equity, in 1853, by the same plaintiffs as in this case, against other defendants. The same questions were made in both of those cases that are presented to the court in this case: first, as to the validity of the patent; and second, as to the infringement. As to the last question, however, in the suit at law, the machine complained of was that of Lerow & Blodgett, and was different from that which is now on trial, which is the Singer machine. But in the suit in equity tried last year, the Singer machine was the subject of complaint—a machine similar to that against which an injunction is now sought. The earnestness and zeal with which the contestation has been carried on, as well as the nature of the machine, its effect on the industry of the country, if it prove to be successful to so great an extent as is hoped—show the importance which is attached to the questions involved, and to the rights which are claimed, on the one side or the other. There is no doubt that, if the machine be a successful one, it must be of great importance to the community, and to the individual inventor whose rights are now sought to be enforced. And, on the other hand, if the defendants have a machine which they can use without an infringement of the plaintiff's patent, it must be of great value and importance to them. The parties, therefore, will naturally, so long as there is any ground of hope, carry on a legal contestation. It is the duty of the court to hear everything that may be presented in every new case, especially all the new evidence that may bear upon the questions at issue; to form an unbiased opinion, and announce it clearly and unequivocally, that the parties, at least, may understand

what is the opinion of the court, for their guidance in the future, as well as for the decision of the case now before the court; for, as it has been intimated by the respondents, the court may readily suppose that there are other cases which are dependent, directly or indirectly, upon the decision of this.

There are certain great features in this case, which are settled by the evidence, and about which there really can be no controversy, and which are of great importance in weighing the evidence upon minute questions, where there is controversy as to what took place many years ago, depending solely, in many instances, upon the memory of individuals called upon to give testimony.

This patent of Mr. Howe was obtained in 1846. Up to that time, the public was in possession of no similar machine for sewing. So far as the evidence is presented to the court in this case, such an instrumentality for the saving of labor was not then known. Such an invention had never been practically used—I mean it was not known to the public for any practical or useful purpose. Whether it was known, within the meaning of the law, in the case of Mr. Hunt's machine, the court will consider hereafter. The first machine for practical use was made upon Mr. Howe's patent; and since he obtained that patent, numerous machines have been put in operation—those of Lerow & Blodgett, and those of Singer, which have been before the court on a former and on the present occasion; and, as it has been stated, these machines have entered largely into the industry of the country, and with great benefit, for the purpose of saving labor previously performed by hand-service.

Now to whom is the public indebted for the present useful improvement or useful existence of the sewing-machine? Upon that, there is no question. There is no evidence in this case, that leaves a shadow of doubt, that, for all the benefit conferred upon the public by the introduction of a sewing machine, the public are indebted to Mr. Howe. The constitution of the United States contains a provision which is the source whence congress derives the power to give to inventors an exclusive right, as against the community; and all the legislation of congress is founded upon that provision, and intended to carry it out. What is that provision? That congress shall have power "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." Now, who has promoted this useful art? Who is it, in this case, that comes within the meaning of the constitution, that to promote the useful arts, congress shall have power to secure to inventors their inventions? Unquestionably, Mr. Howe, and no other person. I mean no other person has given to the public this invention, from the evidence before the court. Therefore, if the legislation of congress has carried out the provision of the constitution, which had for its object the promotion of the useful arts, by securing to inventors their inventions, that legislation would naturally give the benefit to Mr. Howe. Still, it may not have done so. The acts of congress may be so framed, that they may fail of carrying out that purpose and that intent of the constitution in this instance, and in other instances; and the court is then called upon to say whether, under the law as enacted by congress, Mr. Howe is entitled to his patent; for the constitution gives him no right; it has only given a power to congress, if congress sees fit, by legislation, to secure to him, for a term of years, the exclusive right to his invention.

Then we look at the legislation of congress, to see what are the requisites to entitle him to a patent, and we find that he must be the first and original inventor; and that the thing which he invents must not be known or used, before he has obtained his patent or made his invention. That has often received a judicial construction; and if there has preceded the invention, for which a patent has been obtained, another invention of the same kind, and that has been perfected within the meaning of the patent law, so as to be of practical utility, and not to end in mere experiment—then it has anticipated the subsequent discovery, or invention, and such invention can not be entitled to the monopoly or exclusive privilege that is claimed by the patent.

The first inquiry here is, whether Hunt's machine, which is alone relied upon as having preceded Mr. Howe's, was ever perfected, within the meaning of the law; and a second is, whether it had not been abandoned and forgotten before Mr. Howe's invention. These are the two questions to which I shall give my attention; because I do not think it necessary to go into the question of the similarity of the Hunt machine to Mr. Howe's. But I go directly to the question whether Mr. Hunt's machine, as he made it, was perfected; or, in the second place, if perfected, whether it was forgotten or abandoned?

The evidence, tending to show that the machine of Hunt was perfected, may be divided into three classes. There is the evidence of its product—what work the old machine did. In the second place, there is the evidence of the recollection of witnesses of what the machine was. And in the third place, there is the evidence derived from the remains of the old machine, produced here, and the opinion of experts, founded upon those remains, of what the machine originally was. These three classes of evidence the defendants have presented for the consideration of the court; and certainly, that evidence would be entitled to great weight and consideration, standing by itself. But it is encountered by certain facts, indisputable and unquestionable, in this case, which

are so entirely inconsistent with some parts of that testimony, that we are called upon to determine which shall yield.

Now, this machine of Mr. Hunt was invented in 1833 or 1834. It does not appear, from the evidence, that there were ever more than two machines made. Mr. Hunt says, himself, there were two or more, but he gives no account of more than two. The inference to be drawn from all his statements is this: that he began one machine and worked upon it for a while, and advanced it, by his own labor and genius and industry, to a certain stage; and then made another machine, which embodied what he had then accomplished; and this was the machine which he transfererd to Arrowsmith, and which was subsequently worked upon by Adoniram Hunt, his brother, the remains of which are now produced. The first machine has entirely disappeared, and no one, excepting Mr. Hunt, has testified to ever seeing it, or any part of it, unless some old irons mentioned by Arrowsmith as formerly seen by him, in the shop, may have belonged to that machine.

The only machine, therefore, to which the evidence in this case applies, is that, the remains of which have been produced, as found by Arrowsmith, among the rubbish of his shop. That machine is seen, in 1834, in New York, by several persons; it is then transferred by the inventor, Walter Hunt, to Arrowsmith, who carried on the machine business; and, under Arrowsmith, Adoniram Hunt, the brother of Walter went on experimenting upon the machine for the next year, 1835. During that time it was carried to Baltimore, where Adoniram Hunt went with it, and from which place a considerable portion of the testimony is derived, as to the condition and operation of the machine.

We will now consider the work performed by that machine. The question is, whether that machine was perfected, within the meaning of the patent law, so as to prevent any subsequent invention or discovery being first in the meaning of the law, and so entitled to a patent. The patent law goes undoubtedly upon the ground, that when a man, by his knowledge and skill, has made and perfected a machine, the public are then put in possession of the invention, and have the benefit, in some form, of that knowledge and skill; and that the man who comes afterward can not deprive the public of that benefit, though he may be an original inventor of the machine. He has not given the consideration for an exclusive privilege, because the public had it before; and although he may have the merit of invention, he can not have the right to take from the community that which they possess by the invention of another. A machine, therefore, in order to anticipate any subsequent discovery, must be perfected; that is, made so as to be of practical utility, and not to be merely experimental, and end in experi-

ment. The terms "being an experiment," and "ending in experiment," are used in contradistinction of the term "being of practical utility." Until of practical utility, the public attention is not called to the invention; it does not give to the public that which the public lays hold of as beneficial.

If it is an experiment only, and ends in experiment, and is laid aside as unsuccessful; however far it may have been advanced, however many ideas may have been combined in it, which, subsequently taken up, might, when perfected, make a good machine, still, not being perfected, it has not come before the public as a useful thing, and is therefore entirely inoperative as affecting the rights of those coming afterward. This is important to be understood, because the idea has been carried all along, that if a prior inventor has gone to a certain extent, although he fall short of making a complete machine, practically useful, those who come after him have no right to secure to themselves the advantage of their invention. That is not the law. If Mr. Hunt did not go to the extent of having perfected a machine, although he made many ingenious devices, it was, in the eye of the patent law, a nullity; it gave nothing to the public; it was only an idea never carried out in a machine that could anticipate one subsequently invented. Now, that Mr. Hunt made an ingenious machine, there is no doubt; and that, in many respects, it was like Mr. Howe's machine, there is no doubt; that it had a needle similar to Mr. Howe's, operating upon a vibrating arm, and going through the cloth, then a shuttle that passed through the loop made by the needle thread, and thus making a stitch by drawing it up into one side of the cloth, somewhat like Mr. Howe's, there is no doubt. He advanced so far that he made a machine that would, to a certain extent, sew. The question is, whether it was perfected, within the meaning of the patent law; or did it end in experiment?

Now, there is a class of witnesses called to testify that they saw the work which this machine did. There are a large number of these witnesses—I think ten or twelve. These may be divided into two classes: those who looked at it merely as a matter of curiosity, as a new invention; and those who had some pecuniary interest at stake, either as owners of the machine, or as called upon to take an ownership in it. Many of them are women. One class, which is new evidence in this case, I will refer to, because it is new, and more important as aiding the court, not having been before the jury or the court before: that is the testimony derived from the Johnson family, residing at Baltimore—father, mother, two or three daughters, and Eleazer Johnson, the son. His testimony is of great importance. It is new and un-

questioned. I shall consider that distinctly hereafter.

What is the testimony of this family? It is this: that Adoniram Hunt had this machine at Baltimore, while boarding in the Johnson family, and that one evening while there in 1835, he brought the machine to the house, to exhibit it as a matter of experiment and curiosity, and there sewed what they called unbleached muslin, or cotton cloth; and they described it as having sewed an excellent seam of some length; and the daughters, particularly, speak of it as performing good work, beautiful work, strong work; the mother also speaks of it well. That would seem to be very satisfactory as to the result of that machine; but they are speaking of a transaction which took place in 1835, and giving affidavits in 1853—eighteen years after the event. Their recollection has to be carried back eighteen years, to what took place then, as to the impression upon their minds on seeing a sewing machine—the first one they had ever seen—a great curiosity, carried to their house in the evening, and there shown to them; and they are now called upon to state what was the impression made upon them at that time. Well, if it sewed at all, it would be strange if it did not make a remarkable impression upon them. It was entirely new; the operation of the needle and the shuttle was new to them. The work then done was never used for any purpose whatever; it was never appropriated to any practical use—never designed for any practical use; it was merely an experiment, to show them what the machine would do, and there it ended; and their attention was never called to it afterward, for eighteen years.

Then comes the testimony of Mr. Eleazer Johnson. He speaks of its work while he and Adoniram Hunt were experimenting upon it, and he says that they made certain canvas tools, which were appropriated to a certain use in passing hot air in the shop where he worked. That is the only practical use that any product of this machine was ever put to.

We come, then, to New York, where the machine was invented; where it was owned; where the inventor lived, and where Arrowsmith, who purchased it of him, lived, and where it was left after it came from Baltimore. It was seen by various persons there, and its work examined. Some describe it as sewing well; but in no single instance was the work done for use, of any name or description, and in no single instance was the work done ever put to any use whatever. This machine was never used for any purpose whatever, nor was any person ever known to seek for it, or for its product, to be appropriated to any use whatever. Now, it is a little remarkable, that a perfect sewing machine, such as is described by the witnesses as producing beautiful work, strong work (as some of them say)—a machine perfected, and, as some of the experts say, better than Howe's; and one of them says, a machine in some respects better than any machine he had ever seen; yet never produced work that anybody ever used for any purpose whatever, in the city of New York, or ever sought to use for any purpose, whatever; and that it was laid aside for years, without producing either work, or propagating itself in other machines, ever after—that is a phenomenon that requires to be accounted for.

I have said that there was only one instance in which any product was appropriated to any practical use; and that was in the case of the canvas tubes, spoken of by Eleazer Johnson. The fact is an important one, and his testimony is of great importance in this case. How does he state that fact? In the second deposition obtained by the plaintiffs (the first having been obtained by the defendants), it is stated that Adoniram Hunt lived in his (Eleazer Johnson's) father's family, and worked with him in the same shop; that he himself was a machinist; that Adoniram Hunt was a machinist; that they were together by day and evening; that Adoniram Hunt, under Arrowsmith, was at work, trying to improve that machine, after it went into Arrowsmith's hands; that he worked in the evening, and at odd times of the day, during all the six or eight months that he was at Baltimore, and that the witness assisted him, evening after evening, as a friend, in trying to complete and perfect that machine; and they were experimenting upon it during the whole time that Adoniram Hunt was there.

That is his express language, that the whole time that Adoniram Hunt was there, they were experimenting on the machine; and certainly, it ended in experiment, if he is to be believed. They did nothing but experiment. How came these canvas tubes to be made? He says they sewed those tubes to see the effect of their changes—as an experiment to show how the machine would operate; and having sewed some of them, they were found to be such that they could use them for the purpose of connecting two metallic tubes in carrying hot air, after having soaked them in oil and white lead. He is asked as to the time it took to sew these tubes, and whether the value of the product was equal to the time spent. He answered that the time was of no account; that they were experimenting, and did not, therefore, consider the time, as to the making of these tubes. Now, nothing can be clearer than that that was a mere experiment. They did not sew the canvas tubes for the purpose of getting the product, but for the purpose of seeing what the machine would do under the improvements they were making; and having succeeded in sewing some of them, instead of throwing them away, they appro-

priated them to a use that was in itself temporary—to the conducting of hot air, which consumed them, as is testified, at the rate of one a day. That was the whole extent of it.

I consider Eleazer Johnson's testimony, so far from going to strengthen the case of the defendants, as decidedly going to show that, at Baltimore, the machine was merely experimental, from beginning to end. He says so, in terms. He goes further, and states the difficulty and the defects in the machine, to a certain extent. He says that it would sometimes sew, for six or eight inches, a perfect seam. At other times it would drop stitches, make miss-stitches—the threads would lie along, not being looped together, while the shuttle would stop in the race; and he further adds that they could not ascertain the cause why it stopped. They tried to do it, they experimented, they improved upon it; but he distinctly swears that during the whole time the machine was in Baltimore, that difficulty existed, and that Adoniram Hunt and himself, both machinists, working on it for the purpose, could not ascertain why it was that the shuttle would not go through the race, but would sometimes stop, and sometimes did not stop; thus rendering it entirely uncertain whether the work would be done or not. The needle would continue to operate, and go through the cloth, but the shuttle would not go through the loop, and then, of course, no stitch was made, and there would be a space, longer or shorter, not sewed, and the work was ruined; and from his testimony, nobody could tell when the machine was put in motion, how it would operate. In that condition it was brought back to New York in 1835; and I think there is no evidence to satisfy the court that any improvement was there made. The single piece of evidence that has any tendency to show that there was, is the letter of Adoniram Hunt written in 1836, to Mr. Johnson, at Baltimore, which is mere hearsay, not under oath, which was admitted to be read, because the counsel for the plaintiff did not object to it. In this letter, Adoniram Hunt says, that he had been at work upon the machine, and made it work to a charm. That is his statement, not under oath, in the spring of 1836. But Arrowsmith, who owned the machine, under whom Adoniram Hunt performed the labor, and by whom he was paid, swears he never learned of any improvements he made upon it after it returned to New York. The man who owned the machine, and for whom Hunt was at work, did not know of any improvements. That is under oath; and no other witness deposes to any improvements.

Now, it is not a little remarkable, that if this machine was of value in Baltimore (to take that locality first)—if it sewed as well as is represented by some of these witnesses, after a lapse of eighteen years—it is not a little remarkable that no specimen of that sewing has been preserved, that no offspring of the machine has been presented, and that those people at Baltimore, the Johnsons, never sought to have a copy of the machine made for their own use.

If it was useful for making those canvas tubes, as stated by the son, and saved his mother the trouble of sewing, how does it happen that Eleazer Johnson, having worked month after month, to aid in the experiments in improving the machine, did not ask the privilege of making one for his own use, if it was worth making? How does it happen that the mother and daughters, if it produced such work, did not desire their brother to get one for their own use? The manufacturer was a person in their own family, yet they never expressed a wish for one. There was Arrowsmith, who had the ownership of it; there was Adoniram Hunt, both in Baltimore, but nobody there, or any where else, attempted to obtain, or expressed a desire to obtain, the use of that machine, for any practical purpose whatever.

Then we have the testimony of two witnesses, Mr. and Mrs. Carlock, who testify in reference to the product of the machine. Mrs. Carlock says the work was bad, and gives a particular description of it; that it was what is called a mail-bag stitch. Mr. Carlock states that there were places where no stitches were made, and that the machine dropped stitches; places were left in the work so large that you could put your finger through. That exactly corresponds with the testimony of Eleazer Johnson, as to the particular defect existing in the machine.

As to the description of the machine given from the recollection of the witnesses, there are also two classes of witnesses—the experts and those who are not experts. First, we have the testimony of women, to whom the machine was shown. They would undoubtedly recollect whether there was a machine or not. Their attention would be directed as to whether there was a needle, or a shuttle, and perhaps to some other principal parts. They do not attempt to go further than that. Their testimony as to the construction of the machine gives us no aid on the question we are now considering.

The only persons whose statements as to the character of the machine can be of any value whatever, are those who are machinists, and who examined it as machinists. Of this character are Mr. Walter Hunt, Mr. Wood (who is a new witness), Mr. Eleazer Johnson, and Mr. Arrowsmith. I do not recollect any other persons now who can be competent to form an opinion upon the character of the machine, who have undertaken to speak of it from recollection. Mr. Walter Hunt does undoubtedly go to the extent of undertaking to recollect the whole machine, and to profess to be now able to construct it from recollection. But he is the only one. I say this advisedly, because upon examination of the affidavits of the other witnesses,

I find that they do not assume to be able to do this. Take the affidavit of Mr. Wood—which is the strongest one. He says expressly, that he can not, from recollection, undertake to make that machine again; and that he would not undertake, even with the aid of the old remains, now to make it. He does not undertake to say that he could do it. Of course, his recollection is not entire and complete in regard to that machine. He can go to a certain extent; but he says, in express terms, that he would not undertake to reproduce the machine; of course, if he recollected all its parts, and their operations, he could do it. The absence of one of those parts which he can not recollect now, may be the very thing which prevented it from being a complete machine; and therefore his testimony only advances to a certain stage, and does not reach the point. Eleazer Johnson thinks the machine reproduced here is precisely like the machine which was at Baltimore. Then, upon his own evidence, it is an imperfect machine; because he swears that the machine at Baltimore had defects, and that they had never been able to remedy them. If it be true, as stated by Johnson, that this machine is exactly like the one he saw at Baltimore, then the machine here reproduced will not work without that defect which he swears they could not remedy. On the other hand, if it does work, then Eleazer Johnson is mistaken as to its being like that which he saw at Baltimore. Mr. Johnson is asked the same question, whether he could reproduce that machine, and he says he would not undertake to do it. The recollection of that machine, as a complete invention, rests exclusively with Walter Hunt. Others go to a certain extent; some more and some less. Some say there was a needle and shuttle, cams, driving shaft, and other parts; but when you come to the question, whether they recollect all the parts, there is no man or woman who undertakes to say they do, except Mr. Walter Hunt.

He stands in a peculiar situation. In the first place, he has an interest, because he has bought back his invention from Arrowsmith, with a view to obtain a patent; and besides, he has expressed a deep interest in having the reputation of being the first inventor. In the next place, he is contradicted by four witnesses, as to certain declarations he has made; by Cochran, Gardner, Carlock, A. B. Howe, and also by the affidavit of Elias Howe, the complainant. Now, I shall not go into the particulars of that conflicting evidence. Certainly, there is great force in the argument presented by the counsel for the defense, that some portion of the testimony, as to conversations, with Mr. Hunt, is to be received with great caution, as it appears by the letters from Whiting and others to Jackson, that some attempt was made to get Hunt to make declarations inconsistent with his having made a machine which would intercept Howe;

and any statements and declarations made in those conversations should be received with caution. But, making full allowance for that, I can not but think that the force of Mr. Hunt's testimony is materially weakened by that opposing testimony. We must recollect, too, the test applied to Mr. Hunt, in order to show his recollection, as to whether he is able to describe his old machine, as in answer to the eighth interrogatory. I do not go into the question now whether a machine made like that description would be an operating machine. That is a contested question. Suppose it would be—how does he stand? After having laid aside his machine, from 1835 to 1851, he comes then to say what that machine was. What has waked him up to that effort and recollection? The invention of Howe is made public by his having obtained a patent—a suit at law is brought by Howe, in order to vindicate his patent; and then Mr. Hunt is called as a witness for the defense in that suit; and it is in proof that Walter Hunt had seen Howe's specification, and had seen Lerow & Blodgett's machine at work—which is admitted to be a copy and an infringement of Mr. Howe's patent. He had then the advantage before he undertook to describe his machine, made in 1834, of having seen a specification of Mr. Howe's machine, and of having seen a machine in successful operation, made by Lerow & Blodgett, now admitted to be an infringement upon Mr. Howe's invention. Now, what test is it of a man's recollection, if he has these aids? Suppose it to be true, as Eleazer Johnson testifies, that there was a defect in that original machine, which caused the shuttle sometimes to stop in the race; and suppose Mr. Howe had made an improvement by which that was prevented, and Lerow & Blodgett's machine showed how that difficulty was obviated—would not Mr. Hunt see that in a moment—and that single change might make all the difference between the machine being a valuable or worthless one? Then there is the tension on the shuttle-thread. It is insisted by the complainants' experts, that in Mr. Hunt's machine, as described, there was no provision for that tension, so essential for drawing a stitch, and bringing the work together. Suppose there was a defect in Hunt's machine, in that particular, and he saw in Howe's specification how that was remedied—could he not at once incorporate it into his own machine? Might he not think, perhaps believe, that he had something of that sort in his old machine, which he made seventeen years before? He intended to have it—ought to have had it—thinks he did have it. It would be entirely unsafe to rely upon such a test, so many years after the event.

How invariable is it, that after a great invention has been brought before the world, has become known to the public, and been put in a form to be useful, that people start

up in various places and declare that they invented the same thing long before! The cotton-gin, and the ether discovery, are illustrations in point; and others of similar character might be added indefinitely. These pretended prior inventors had thought of such a thing; that they had had the conception of such a thing, perhaps; but they had never carried it to the extent of making it of practical utility, so that the world could obtain possession of it. But when they find that another has completed that which they had begun, they are astonished that they did not see, think they must have seen, all that is necessary, and claim that they have invented it. After having seen what has been done, the mind is very apt to blend the subsequent information with prior recollections, and confuse them together. Prophecy after the event is easy prophecy. I think that this is one of the cases in which several of the witnesses have been led into the illusion of believing that they knew before, what they have learned, or been taught, by Mr. Howe's invention and specification.

We come, then, to another part of the evidence—these old remains. These are very important, undoubtedly; for when a new invention is sought to be intercepted by a former one, the production of a former machine is—I will not say essential—but of very great importance; showing that it does not rest merely in the recollection of witnesses that there was such a thing. These are the remains of a machine, claimed to be invented by Mr. Hunt, as a sewing machine, which was in the hands of Adoniram Hunt, and transferred to Arrowsmith, kept by him, and found by him, as he states, in 1851, in the rubbish of his workshop. They exhibit some of the instrumentalities, but certainly, to the eyes of those who are not experts, but few of the means of forming a sewing machine; and to the eyes of the experts, they present the same deficiency. One, at least, of the defendants' experts, when he was called upon on a former occasion, looked at them, and then testified that there was nothing there from which a sewing machine could be constructed. He says now, that he has changed his mind, upon a more careful examination. At first view, then, they would present no satisfactory evidence of having been a sewing machine. The experts differ materially, as to that old machine. Those for the defendants say that they saw there sufficient to enable them to construct a sewing machine, by the aid—I think all of them put in that—of the reproduction made by Walter Hunt from his memory. I do not think any of them go so far as to say that, from that old machine alone, they could undertake, without other aid, to make a sewing machine that would operate. They thought that, from these old remains. there might have been constructed the machine that is described by Walter Hunt; they thought there was room enough

to make such a machine. Then a part of that restored machine rests solely upon the recollection of Mr. Walter Hunt. Now, can any man say, from that old machine, that Eleazer Johnson's testimony is not true, when he says it did not operate? How can any man say that there was not a defect which prevented the shuttle from going through the race?—a defect, of which the persons, and they experts, having the machine entire before them, could not ascertain the cause. Can these experts ascertain the cause, from the mere dry bones of this old machine, divested of its muscles and nerves? They say it must have operated. Their reasoning is evidently the reasoning from analogy, which is very likely to mislead men. The reasoning of Cuvier, by which, from seeing a few bones, he could reconstruct the whole animal, proceeded upon the assumption that the animal was a perfect work, made by a Creator perfect in his operations; and if the animal was a perfect work, then he could see, from its remains, what must have been necessary to make that perfect work. But that would be assuming the point in controversy here. If that old machine was not a perfect work in the hands of Mr. Hunt, how can these experts say, from those remains, how that machine was made—how the other bones, the other operative parts, were placed? Thus, they assume the very question which is here to be tried—whether the old machine was perfect or not.

The experts say that several parts of the old machine are the same as those parts in the new. Undoubtedly, as far as those parts go, they are the same as in the new machine. But how is it with those parts that are not in the old machine? These experts can not say, reasoning by analogy, except upon the assumption that it is a perfect sewing machine. They may say, that in order for a sewing machine to do practical work, it must have had certain instrumentalities; but the very difficulty is to show that the original machine was a perfect one; and it is insisted by the experts, introduced by the complainants, that it could not have been a perfect machine. Those experts say they see nothing there which could satisfy them that it could have been perfect; but, on the contrary, they say, that the restoration made to resemble the old machine is a very clumsy contrivance to obviate difficulties. This old machine may be the imperfect remains of an imperfect machine. That is all it proves itself to have been necessarily.

Then, on the other hand, there are certain great facts which I must advert to now. This invention was appreciated by Mr. Walter Hunt himself, and by Mr. Arrowsmith, to whom he transferred it, to be a matter of great importance. Arrowsmith says he had it in contemplation to get up a company, and if they could succeed in making the machine work, it would make

as much money as he and his associates all would want. Mr. Hunt, when he transferred, as he did at first, half of the machine to Arrowsmith, stipulated for one-half the profit to be derived from it. They then had hopes of perfecting it; and it certainly needed no extravagant imagination in them, to suppose that if they could succeed in perfecting a sewing machine, which should be of practical utility, it would be of great value. They continued to experiment upon it, and endeavored to bring it to perfection.

After Mr. Walter Hunt, the original inventor, had bestowed his time and labor upon it, until he was tired, in 1834, Adoniram Hunt, under Arrowsmith, then worked upon it, more or less, six or eight months, trying to improve it. And what was the result of all this? It was that the other half of the machine was transferred to Mr. Arrowsmith by Walter Hunt. Why did not Walter Hunt and Mr. Arrowsmith take out a patent? Is there any suggestion that they were not able? Certainly not! Walter Hunt was carrying on business at the time he sold his old machine to Arrowsmith. What did he sell it for? He did not sell it for money; for he did not get a dollar for it. He got. in exchange. the interest that Arrowsmith had in certain other machines— in a brad machine, and in a machine for making boxes. There is no evidence here that they were worth a dollar; that they ever came to anything. Well, Arrowsmith took it. What did he do? Did he get a patent for it? Did he sell the right to make? No. Did he get anybody to make a second machine like it? Never. Did he put it to any practical use whatever? Never. He laid it aside; and then, it is said, it was injured at a fire—not by a fire, but at a fire; and the remains are found in the rubbish of his shop in 1851; and from 1835 to 1851, there is no satisfactory evidence that Arrowsmith himself, or that Walter Hunt, the original inventor, or anybody else, ever had any interest or concern in this machine, or took any care or thought about it.

Now, that old machine itself bears upon it indubitable marks of its having been an experimental machine, as it is stated to have been. There are certain marks upon it, which the experts for the complainant say are perfectly unaccountable to them. The explanation given is that the machine was an experimental one, and that these springs and devices were put upon it at an early period, in order to make it operate; but finding they did not succeed, they were abandoned, and some other mechanism substituted for them; and thus it bears the marks of the abandonment of those devices. The very answer of the defendants, therefore, to the difficulties presented by the complainants, show that it was an experimental machine. The question whether this was a perfected machine, or rested only in

experiment, and was then abandoned, seems to me clear. What answer is made to the fact, that this very important discovery was thus lost sight of for so many years? Hunt has been living in New York; Arrowsmith is alive, and has been in possession and control of it the whole time; why did they not take out a patent? Arrowsmith gives the answer; and I come to his testimony as to that of the person who knows, better than any other, why it was laid aside, and no patent applied for. He says, it was never so perfected as to be patented; that it would cost from two to three thousand dollars to complete it; that he had not that amount to spend. He says he had money enough to pay for the patent, but he did not have the two or three thousand dollars necessary to perfect it; and that is the reason of his applying to persons to assist him in completing it. But nobody would take any interest in it.

Now, there is evidence brought from Mr. Bennett, in which it is said that Arrowsmith attached a value to the machine as late as 1840, because Mr. Bennett was applied to, to advance money upon it. The only persons who seem to have had an application made to them to take a pecuniary interest in the machine, are Arrowsmith, Carlock, and Bennett; and it is not a little remarkable, that none of them ever did anything with it that was of practical utility, and that two persons applied to, to take an interest, Carlock and Bennett, declined having anything to do with it—Carlock testifying, as the ground of his refusal, that, upon examination, he thought it was valueless. Bennett gives no reason, but states the fact.

Bennett states that, twelve or fourteen years before he gave his affidavit, Arrowsmith showed him some specimens of sewing, and asked him to take an interest in the machine. His impression is that it was fourteen years ago. He had no interest in fixing the date, but thinks it was twelve or fourteen years, perhaps longer. Arrowsmith shows him a piece of sewing done by the machine—perhaps to induce him to advance money upon it. But that is wholly unsatisfactory as fixing the date. and is inconsistent with other testimony. Arrowsmith says that, as far as he knows, he did nothing with it after 1835.

Mrs. Van Buren states, that in 1838. her father, Mr. Hunt,. advised her to go into the business of making corsets, with the aid of this machine. If this be correct it would tend to show, certainly, that Walter Hunt might have attached some importance to it. Mrs. Van Buren says that she consulted with some of her female friends, and, on their advice, concluded not to go into the business. Now, Mrs. Van Buren, at that time. was twelve or thirteen years of age; and it is hardly to be supposed that a proposition to go into business on her own ac-

count, with the aid of a new machine, could have been seriously made to a little girl of that age.

The great fact of this machine having been laid aside, as it was, is not accounted for, and is entirely inconsistent with the idea that it was a perfected or valuable machine at that time.

The whole testimony leaves upon my mind no doubt, that however far Mr. Hunt had advanced with his machine, it was never perfected, in the sense of the patent law; that it was only an experiment, and ended in experiment, and was laid aside as an unsuccessful experiment, until the introduction of Mr. Howe's machine.

What I have already said, renders it unnecessary to go into the other point or the testimony, as to whether that old machine was always in the memory and recollection of its inventor, and could be reproduced, or was abandoned and forgotten. I think it would be difficult to maintain that it was known within the meaning of the patent law, when Howe made his invention.

The other question, as to the infringement, remains. I think there can be no doubt upon that point. The plaintiffs' experts, eight in number, have spoken in the most unequivocal, strong and positive manner, in detail, on the question. The defendants' experts have given an opinion to the contrary, on the supposition of a certain construction of the patent law and the patent—an honest opinion, doubtless. They believe there is no infringement.

The weight of testimony, however, as a matter of opinion, is strongly preponderating in favor of the plaintiffs; and from the examination which the court has been able to give to this subject, aided by the evidence, and by the knowledge and experience of counsel, I am unable to arrive at any other conclusion, than that which the experts for the complainants have expressed. The result is, that the plaintiff's patent is valid, and the defendants' machine is an infringement. An injunction is granted.

[For other cases involving this patent, see Howe v. Morton, Case No. 6,769; Same v. Williams, Id. 6,778; and Hunt v. Howe, Id. 6,-891.]