### AIKEN, (CROWE v.)

[See Crowe v. Aiken, Case No. 3,441.]

---

## Case No. 110.

### AIKEN v. DOLAN

[3 Fish. Pat. Cas. 197;[1] Merw. Pat. Inv. 95.]

Circuit Court, E. D. Pennsylvania. June, 1867.

PATENTS FOR INVENTIONS—ASSIGNMENT —EQUITABLE TITLE—REISSUE—ANTICIPATION — SUCCESSFUL EXPERIMENTS—DISCLAIMER.

1. An assignment of a patent for a knitting needle "to be applied exclusively to the knitting or construction of harnesses for looms, and for other purposes," obviously means harnesses for looms and harnesses for other purposes.

2. Where H. agreed with A. that upon the fulfillment of certain conditions, he, H., would assign to A. the extended term of certain letters patent, if the same should be extended: Held: That if the conditions had been fulfilled A. would have become the equitable owner of the extended term.

3. The conditions not having been fulfilled, the former ownership, legal and equitable, was continued as to third parties, and justice does not even require that a decree should be made without prejudice to the rights of A.

4. Whether, under such circumstances, A. ought not to have been made a party complainant or defendant to a bill filed by the assignees of H. to restrain a third party from infringement, quaere.

5. The decision of the commissioner, extending letters patent, could not have been made without proof that the patentee had not derived a fair profit from his invention during the first part of the original term.

6. Such decision, having been made after public notice and official investigation, shows

that throughout the United States he was generally considered, as he was still considered at the patent office, the first inventor.

7. Although the work and product of a prior knitting needle may have been imperfect, yet if both work and product were seen by persons who have not yet lost the recollection of them, and more than one of the needles, and a machine by which some of them were made, have been preserved to the present day, this would constitute a sufficient prior knowledge by others to prevent a subsequent invention from being new.

[Cited in Electrical Accumulator Co. v. Julien Electric Co., 38 Fed. Rep. 131.]

[See Albright v. Celluloid Harness Trimming Co., Case No. 147.]

8. An improvement, though depending upon a change of form, may be, in purpose and effect, a change in a material part of a process of manufacture, and patentable.

9. An invention may be good which remedies a theoretical defect, although no injurious effects have been observed in practice.

10. The original model, deposited in the patent office, may be examined for the purpose of solving any doubt raised by an inspection of the drawings.

11. Where claim was for "the application of a latch or tongue applied to the hook of the needle, and operated as herein described," and the specification stated that the needle was constructed "in the general form shown in the drawings," and it appeared that needles with a latch or tongue and hook were not new, but that needles with a certain curved swell shown in the drawings, but not otherwise referred to in the specification, were new: Held: That if the knowledge of needles without this swell had been universal or general, the declaration that the needle was constructed "in the general form shown in the drawings" might have sufficed to restrain the claim to needles made with a swell; but, it appearing that the knowledge of the primitive needle, though sufficient to defeat a subsequent patent, was very limited, the claim was broader than the invention. This defect might be cured by disclaimer.

[Cited in Electrical Accumulator Co. v. Julien Electric Co., 38 Fed. Rep. 134.]

12. The complainant by his counsel, proposing, at the hearing to disclaim any construction of a needle which has not the curved swell or its equivalent: Held: That such a disclaimer would deprive the complainant of all right to recover costs in the pending suit, but that there might be a decree for perpetual injunction, each party to pay his own costs, without any actual previous disclaimer of record in the patent office.

13. The defendant having, by the curvature of the swell of his needle, at least partially adopted the patented improvement, both in theory and practice, was adjudged to have infringed the patent.

In equity. This was a bill in equity filed to retrain the defendant from infringing letters patent [No. 6,025] for an "improvement in knitting needles," granted to James Hibbert, January 9, 1849, extended to Peleg Hull, administrator of James Hibbert, deceased, for seven years from January 9, 1863, and on April 22, 1863, assigned to complainant.

Two preliminary questions arose upon two papers executed during the original term of the patent. One of them was an assignment by the patentee in June, 1853, to

---

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

Darius C. Brown, the granting clause of which was as follows:

"Now this indenture witnesseth: That for and in consideration of the sum hereinafter mentioned, I have assigned, sold, and set over unto the said Darius C. Brown, all the right, title, and interest which I have in said invention, as secured to me by said letters patent in these United States, to be applied exclusively to the knitting or construction of harnesses for looms, and for other purposes. The same to be held and enjoyed by the said Darius C. Brown for his own use and behoof, and for the use and behoof of his legal representatives and no others, to the full end of the term for which said letters patent are or may be granted."

The other paper was a contract between Peleg Hull, the administrator of Hibbert, and Herrick Aiken, and was, in full, as follows:

"This agreement made and entered into this twenty-third day of September, in the year eighteen hundred and sixty-two, by and between Peleg Hull, of the city and county of Providence, and state of Rhode Island, administrator of the estate of James Hibbert, late of said Providence, deceased, of the first part, and Herrick Aiken, of Franklin, in the county of Merrimack, and state of New Hampshire, of the second part, witnesseth:

"Whereas, the said James Hibbert did, in his lifetime, to wit: on the ninth day of January, A. D. eighteen hundred and forty-nine, obtain letters patent of the United States for an improvement in knitting needles, which letters patent are now about to expire. And whereas, said Peleg Hull, party of the first part, was duly appointed and qualified according to the laws of said state of Rhode Island, administrator of the estate of said James Hibbert, deceased. And whereas, the said Herrick Aiken, party of the second part, is desirous of purchasing the extension or extended term of said letters patent, if an extension of said letters patent can be obtained, and is willing to pay all expenses of every nature and description of obtaining the same, provided the extended term of said letters patent is assigned to him on the terms and conditions hereinafter stated and agreed to.

"Now this agreement witnesseth, that in consideration of one dollar by each of said parties to the other paid, and of other good and sufficient considerations, the receipt whereof is hereby acknowledged, the said parties covenant and agree to and with each other in the manner following, that is to say: First. The said Peleg Hull, administrator aforesaid, party of the first part, agrees to sign all papers, make all affidavits, and do all other lawful acts and things as may be deemed necessary and requisite by counsel in applying for and obtaining an extension of the term of the said letters pat-

ent; and when the said extension shall be obtained, to assign the said extended term of said letters patent (within twenty days from the date of said extension) to said Herrick Aiken, the party of the second part, or his legal representatives. Second. The said Herrick Aiken, party of the second [part] agrees to pay all expenses of every nature and description incurred or to be incurred in applying for and obtaining an extension of the said letters patent, provided the said extended term of said letters patent is assigned to him or his legal representatives as aforesaid. And he hereby discharges said party of the first part, and his heirs and representatives, from all liability for any part of the expense incurred in applying for said extension, provided said extension is not granted. Third. The said Herrick Aiken, party of the second part, hereby agrees to pay said Peleg Hull, administrator aforesaid, party of the first part, upon the obtaining and the assigning to said Aiken or his representatives the extended term of said letters patent, and at the times and in the manner following, the sum of twenty-four hundred dollars, viz: six hundred dollars upon delivery of the assignment of said extension of said letters patent; six hundred dollars in six months from the date of the delivery of said assignment; six hundred dollars in twelve months from the date of delivery of said assignment; and six hundred dollars in eighteen months from the date of the delivery of said assignment; and said Peleg Hull, administrator aforesaid, agrees to accept the said sum in the manner aforesaid, in full for said extended term of said letters patent.

"In testimony whereof, said parties have hereunto interchangeably set their hands and seals the day and year first above written.

"Peleg Hull,        [Seal.]
"Herrick Aiken,    [Seal.]"

The nature of the invention is fully set forth in the opinion. The claim of the patent was as follows:

"What I claim as my invention, and desire to secure by letters patent, is the application of a latch or tongue applied to the hook of the needle, and operated as herein described."

Injunction granted.

Charles Sergeant, Henry Baldwin, Jr., and Causten Browne, for complainant.

John B. Gest, E. Spencer Miller, and Furman Sheppard, for defendant.

CADWALADER, District Judge. There have been two objections to the complainant's derivation of title from Hibbert, the patentee. One of them is founded upon the assignment to Darius C. Brown of all right, title, and interest in the invention "to be applied exclusively to the knitting or construction of harnesses for looms and for other purposes." This obviously meant har-

nesses for looms, and harnesses for other purposes. The objection, therefore, cannot be sustained. The other objection depends upon the effect of the agreement of September 23, 1862. I will consider this question as it would have been presented if the paper had been produced or its loss proved, and it had been duly verified.

If Herrick Aiken had fulfilled the conditions of this agreement, he would have become the equitable owner of the extended term. But, as he does not appear to have, in any wise. fulfilled them, the former ownership, legal and equitable, has continued as to third persons, if not as between the parties themselves. Justice does not even require that a decree should be made expressly without prejudice to the rights of Herrick Aiken, because, if he has any rights, legal or equitable, in what may be recoverable through this litigation, the complainant will be accountable to him without any such saving clause in the decree. In the mean time, the complainant is the sole party entitled, in the first instance, to redress from other persons. If the right of action had, on the contrary, been divided into fractional shares between the parties to the agreement, the defendant should not have been harassed by a suit in which they were not all made parties. The present is not such a case. Nevertheless, my first impression was that Herrick Aiken ought, according to the rules of procedure in equity, to have been made a party complainant or defendant; and independently of the question of verification, I still have some doubt upon the point. It is to be regretted that the objection has not been removed by amendment. For this, it is perhaps not too late, even now, to apply, if the complainant is desirous to prevent a recurrence of the question in the court of appeal.

The case will next be considered upon the merits of Hibbert's claim to have been the inventor of the latch needle as an optional substitute for the former spring-hook needle in knitting machines. The latch needle has not altogether superseded the spring-hook needle. Both are in use; and the spring-hook needle, though more fragile, may be a preferable implement in the manufacture of certain fabrics of the finer kind. The hook of the latch needle is rigid. The spring-hook needle is hollowed at the proper point for the reception of the end of the hook when depressed. Of this hollow space, and of the machine by which it was made, drawings were published more than a century ago. The hollow thus formed was, long before Hibbert's patent, designated in print as a longitudinal groove. It acquired, however, in the latch needle, the more distinct character of such a groove. In this needle, a pivot passes across the groove through each side of it. On this pivot the latch turns freely, lengthwise, in opposite directions toward and from the hook. It is thus turned by the loop of yarn passing forward and backward. This alternating longitudinal motion of the latch is arrested in the former direction by the hook, and in the latter direction by the termination of the groove into which the latch falls back. The specification of Hibbert's patent stated that the latch needle was designed to work on the knitting frames theretofore used. It has been objected that the specification does not describe the adaptation of this needle to knitting machines. To this objection a sufficient answer is that he claimed only the invention of a new and improved knitting needle, and not the invention of any adaptation of this improved implement. The latch needles are to this day bought and sold, and imported from abroad, separately from the knitting machine, as the spring-hook needles are, and had previously been. There is no reason to doubt that Hibbert honestly believed himself the first inventor of the latch needle. There is evidence tending to refer the date of his invention to the year 1846. Its true date certainly was not later than 1847. His patent was issued January 9, 1849. The introduction of latch needles into general use was, in the language of the answer in this case, "obstructed, perhaps, and retarded by the necessity of altering machines, changing the nature of the fabrics, and, in some measure, by the doubts and prejudices of manufacturers." But as the answer states, the manufacture and use of such needles gradually increased in extent until 1852, and having by this time become general, afterward increased more rapidly, "causing the alteration of machines and of fabrics to suit" them, etc. The testimony shows that this more rapid increase did not begin till after 1853, and that it may probably have been due mainly to improved adaptations of knitting machines. On December 29, 1862. it was decided by the commissioner of patents to extend Hibbert's exclusive privilege for seven years after the expiration of the first term of fourteen years, and it was extended accordingly. This decision could not have been made without proof that he had not derived a fair profit from his invention during the first part of the original term. The decision, having been made after public notice and official investigation, shows that throughout the United States he was generally considered, as he still was considered by the patent office, the first inventor. This belief may have been confirmed by the knowledge that in February, 1849, the month next after that in which his original patent had been issued, the invention was patented in England to another person as a novelty there. For some time after this extension, the rights of Hibbert appear to have been generally recognized in the United States. A person who. since 1853, has constructed "perhaps 1,000" machines for latch needles, took, in 1864, a license for making and using needles, under Hibbert's patent, at a certain rate or toll. At the date of the answer in this case

(September 6, 1866), an opposition to the patent seems to have been more or less organized. At this time there were, according to the answer, some forty or fifty manufactories in the city of Philadelphia alone, which worked with latch needles, and employed with them from ten to fifteen thousand hands.

Hibbert's invention thus appears to have been original, whether the subject of it was new or not. What has been stated suffices to show that the subject had not been generally known or used either in the United States or in England. From all the proofs in the cause, moreover, it fully appears that the latch needle had never been used with profitable results in either country, certainly not in the United States. The needle and its use may, nevertheless, have been sufficiently known to a few persons to prevent it from being new. The improbability of this may diminish when we recur to the causes which prevented the invention from becoming profitable during several years next after the date of the patent.

A latch needle, according to the general description heretofore given, had been devised by Jeandeau in France, where he obtained a patent for it in 1806. His description of it was published in a printed book in 1831. How far such needles were afterward made and used on the continent of Europe, it would be useless to inquire, because they certainly were made and experimentally used in the United States a great many years before 1846. In one prior instance, at least, they were openly used in making an experimental fabric. The work and its product were imperfect; but both work and product were seen by persons who have not lost the recollection of them; and more than one of the needles, and a machine by which some of them were made, have been preserved to the present day. This was a sufficient prior knowledge by others to prevent the subsequent invention of Hibbert from being new. I have, therefore, not fully considered the objections which have been urged against Jeandeau's description of his invention, though I have not as yet been convinced of their sufficiency.

If the case rested here, the bill must be dismissed. But three questions remain for consideration: 1. Whether Hibbert was not the first inventor of a distinct patentable improvement of the primitive latch needle; 2. Whether, and how, his actual patent can be sustained as to this improvement; and, 3. Whether his limited right to it has been infringed.

I. The primitive latch needle, not only that of Jeandeau, but likewise that made and used as above in the United States, was formed without any elevation or swell at the middle of the groove, and without any depression beyond the pivot to that extremity of the groove which is furthest from the hook. At this extremity of the groove, where the latch falls back, the end of the latch must, in order that the loop may pass under it and raise it, be above the surface of the needle. This remark applies both to the primitive latch needle, already described, and to the improved latch needle hereafter described. But from this cause, in the primitive needle, the end of the latch when at this extremity of the groove, had necessarily a projection upward from the surface of the needle. Now, in the primitive needle, the yarn when passing backward from the hook, was held down to the surface, first of the needle and afterward of the latch, and was thus, on reaching the projecting end of the latch at the furthest extremity of the groove, jerked over the projection, with more or less of shock immediately following tension. The strain, with shock, must thus have occurred after every stitch. Whether any consequent injurious effect was externally perceptible in the texture of the fabric, is uncertain. There may have been none thus perceptible. But, however this may have been, there certainly was here, in theory, a defect in the operation of the primitive needle—a defect which it certainly was desirable to remedy. A needle of this primitive form was represented in the drawing which accompanied Hibbert's caveat, filed in the confidential archives of the patent office. The date of this caveat was March 31, 1847. In the course of the summer of 1847, Hibbert, when at work in a manufactory of coarse hosiery, made or caused to be made, latch needles with a curved elevation, since called a swell, which was highest at the middle of the groove, and with such a corresponding elevation of the pivot that the end of the latch was depressed when it fell back at that extremity of the groove where the latch of the primitive needle had projected upward. The curvature of the swell was determined so as to effect this depression of the latch with a sufficient longitudinal extension of the latch beyond the furthest extremity of the groove to receive the returning thread underneath. The remedy of the former defect was thus, in theory, complete. The improvement, though depending upon a change in form, was, in purpose and effect, a change in a material part of the process of manufacture. Tension of the yarn occurred at the swell, but was graduated so as to avoid shock. The witness, Emerson, has verified not only one of these working needles which has been preserved, but also a blank, as it is called, of another one, that is to say, an unfinished needle, with the swell prepared for the process by which the groove was to have been made. He states expressly that he commenced making such needles in June, 1847, and continued making them until October, 1847. The earliest construction of a needle with such a swell by any other person was at a later period in that year. Emerson, who worked by the hour for the hosiery company by whom Hibbert was employed, is explicit as to the date of the summer of 1847. Two

other witnesses depose not less explicitly to the making of such needles by Hibbert. One of them says it was in the summer of 1846, and fixes the time by a visit of the third witness to Squam and Cape Ann during that summer. The latter witness deposes that it was in the month of June, immediately after the battles of the Rio Grande, and that he did not know whether it was 1846 or 1847, adding: "I went to Cape Ann on a visit immediately after those battles, and what fixes it in my mind is, the old gentleman whom I visited was much taken up with the matter, and could talk of nothing else; he was very patriotic; and during my stay at Cape Ann, there was one of those needles made and put in the loom." It is to be observed that though the first battles on the Rio Grande occurred in May, 1846, yet, in the following year the campaigns elsewhere in Mexico were probably of quite equal interest to the witness's talkative patriotic friend, and that the witness himself says he does not know whether the year was 1846 or 1847. I would have some difficulty in reconciling 1846 with Hibbert's drawing, which accompanied the caveat of March 31, 1847. There is no such difficulty if we apply the testimony of these two witnesses to the year 1847. Thus understood, they confirm Emerson, and he confirms their statements. The specification of Hibbert's patent was prepared afterward. It stated that he constructed his needle in the general form shown in drawings, all of which represent a needle with such a curved swell. He thus appears, upon the proofs, to have unquestionably been the first inventor of such an improved latch needle. But independently of any question as to the legal sufficiency of the specification, the respondent has relied on the drawings accompanying it as showing an upward projection of the end of the latch greater than consists with his having had the conception of any true theory of this improvement. The drawings were sketched very roughly; and without a comparison of them with the model in the patent office, there might possibly have been some little doubt under this head. The doubt is precisely such a one as a model may properly resolve. The model has been produced. Upon a first inspection of it the doubt seemed to be increased rather than removed, for the latch did not fall back to the bottom of the groove. An examination showed, however, that the latch has not now the free turn, or sweep back, described in the specification. This want of free play in the latch was evidently occasioned by an accidental compression of the groove. The cause of the compression was apparent externally. The latch, when it was gently forced down to the bottom of the groove, where it would have dropped back, if the play were free, had no upward projection. Nor had the latch in the needle produced by Emerson, in which the play was free. The accidental condition of the model is unimportant. Its normal condition is quite obvious, and when properly considered, removes any doubt which the drawings might otherwise have suggested.

II. But when the actual invention is thus referred to this improvement alone, the claim in the specification is too broad. It states that the invention consists in the application of the latch or tongue in connection with the hook of the needle, sweeping freely back and forth upon the center pin. The general operation of a latch needle is described, without any specific restriction to the form represented in the drawings. Then follow the words: "What I claim as my invention is the application of a latch or tongue applied to the hook of the needle, and operated as herein described." If the knowledge of latch needles of the primitive form had been universal, or even general, among those best acquainted with the use of knitting machines, the declaration that he constructed his needle in the general form shown in the drawings, might perhaps have sufficed to restrain the claim to the specific improvement in the curved needles exemplified in the form with a swell, and including, of course, other curvatures of equivalent effect. But this interpretation is both morally and legally inadmissible. According to the proofs of the state of the art at that period, the knowledge of the primitive latch needle, though quite sufficient to defeat a subsequent patent, was very limited—so limited as to exclude all possibility of the inference of any general knowledge on the subject. The patent is therefore broader than the actual novelty of the invention. By a proper disclaimer of the invention of latch needles without any such curvature, the patent would, however, be sustainable for the actual improvement. The complainant proposes, through his counsel, to disclaim any construction of a latch needle which has not a swell or its equivalent substantially as shown in the drawings, and to repeat, in the words of the original specification, that what he claims as the invention of the patentee is the application of the latch or tongue, etc., operated as therein described. The effect of such a disclaimer will be to deprive the complainant of all right to recover costs in the present suit. But a court of equity sometimes considers that which might and ought to be done as having already been done. There may, therefore, be a decree for a perpetual injunction, each party to pay his own costs, without any actual previous disclaimer of record in the patent office. According to the decision of the supreme court in O'Reilly v. Morse, 15 How. [56 U. S.] 121, it might perhaps be supposed that I should go further, and, before any actual disclaimer, decree an account, or order an issue quantum damnificatus. But I do not think that a court, whose decision is liable to revision upon appeal, should, in such a case, make any decree beyond the perpetual injunction without an actual disclaimer previously recorded in the patent

office. In the present stage of the case, therefore, I can do no more than award the injunction, with leave to disclaim, and afterward to move for such further order for an account, etc., as may be deemed proper. Whether an injunction shall be thus awarded depends upon the decision of the third question.

III. Has the defendant infringed the complainant's rights, restricted, as they are, to the specific improvement invented? It will be recollected that the latch needle with a curved swell was used by Hibbert in the manufacture of the coarsest fabrics. Instead of a curved elevation, thus highest where the pivot crosses the groove, the latch needles afterward used for finer work had a curved depression beyond the pivot, toward the extremity of the groove which is furthest from the hook. For the prevention of shock or erk at the end of the latch, this depression was, in effect, a mere equivalent for the swell. In the application of this remark, the comparison must be with the primitive latch needle. The curved depression was, in another respect, an improvement upon the swell. This improvement consisted in maintaining a more equal tension of the yarn.

The defendant objects that the needle with a swell was unfit for the manufacture of finer fabrics; that for all fabrics the swell was a positive disadvantage instead of an improvement, and that the curved depression is altogether different, and was a real improvement. He admits and justifies his use of latch needles with the latter curvature. On examining these needles, their curvature appears to have been so determined as to become a precise equivalent for the swell in preventing an upward projection of the end of the latch at the extremity of the groove furthest from the hook. Assuming the correctness of his objection to the swell, and of his assertion of the superiority of the depression, these are not absolute, but relative differences between the effects of the two curvatures. The latter curvature was at least a partial adoption of the patented improvement, both in theory and in practice, and was therefore an infringement. The defendant has also used other latch needles with just such a curved swell as the drawings of Hibbert's patent exhibit. This he justifies or excuses upon the allegation that the swell was a mere objectionable excrescence, caused by the method of making the needles. In the language of his principal witness, they are made by swedging out the slit or grove, instead of sawing it out. He describes this process of swedging, and how it may produce the bulge or swell upward. The argument hereupon is, that by filing down the swell, the needles, though impaired in strength, might be more useful for certain kinds of work. To all such arguments, upon the mere question of infringement, the ordinary answer would suffice. Let the swell be filed off, and the needle, without

it, may be used. It is not necessary, therefore, to inquire whether the spring needle might not be preferable for such work as would require the swell to be filed out.

But, upon this part of the case, I was, during the second argument, very desirous to learn whether, before Hibbert's patent, spring needles had been made with such a bulge or curvature. They are now sometimes made with it, and if this had occurred before the patent, I was not quite certain whether it might not, perhaps, with reference to the phraseology of the specification, have some legal operation upon the effect of the complainant's proposed disclaimer. It now appears that spring needles were, of old, made with a lateral or outward bulge; but it has not appeared that they ever had a bulge or swell upward. The inquiry, therefore, does not arise; and this part of the case depends upon the question of infringement alone. Upon this question the argument for the defendant can not be sustained. He should, therefore, be enjoined against making or using any such needles as those of which specimens are exhibited on the paper annexed to the deposition of John Taylor, and against using any needles of such a curvature as to depress the end of the latch where it falls back at the extremity of the groove furthest from the hook, or any curvature of equivalent effect.

[NOTE. Patent No. 6,025 has not been involved in any litigation other than above, so far as shown by reported cases prior to 1880.]